## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PATIENT TO PERSON, LLC, | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | C.A. No. _____ |
| | : | |
| CAREISMATIC BRANDS, LLC, | : | |
| f/k/a STRATEGIC PARTNERS, INC., | : | |
| CAREISMATIC SV LLC f/k/a | : | |
| SILVERTS ADAPTIVE, LLC, and | : | |
| SILVERTS UNIVERSAL DRESSING | : | |
| SOLUTIONS, INC., | : | |
| *Defendants.* | : | |

## COMPLAINT

Plaintiff, Patient To Person, LLC ("PTP"), by and through its undersigned attorney, hereby brings this action for treble damages and injunctive relief against Defendants, Careismatic Brands, LLC, formerly known as Strategic Partners, Inc. ("Careismatic"), Careismatic SV LLC, formerly known as Silverts Adaptive, LLC ("Silverts CA"), and Silverts Universal Dressing Solutions, Inc. ("Silverts DE", and together with Silverts CA, collectively, "Silverts"), pursuant to Sections 4 and 16 of the Clayton Act, for violations of Sections 1 and 2 of the Sherman Act, for violations of Massachusetts G.L. ch. 93A, and for additional state law claims for breach of contract, breach of the duty of good faith and fair dealing, and tortious interference with contractual relations. Plaintiff complains and alleges as follows:

### Introduction

1.    This antitrust action arises from an unlawful, deceptive, bad faith, and anticompetitive series of coordinated acts by Careismatic and Silverts to unlawfully misappropriate certain intellectual property and other confidential information licensed to them by PTP, a small, Massachusetts limited liability company, and to subsequently monopolize, or attempt

1

to monopolize, the burgeoning market in the United States for post-surgical, treatment and recovery wear targeted to patients recovering from a serious medical illness.

2.     Careismatic markets itself as a global leader in healthcare and medical apparel and uniforms, with a diverse portfolio of brands that specifically cater to healthcare professionals and institutions worldwide.

3.     During the time period encompassing a portion of the allegations stated herein, Silverts CA was a wholly-owned subsidiary entity of Careismatic, and itself specializes in producing adaptive clothing for patients across the medical spectrum with varying conditions, including primarily elder care, memory care, and assisted living patients.

4.     Careismatic and Silverts unlawfully, deceptively, and in bad faith, coordinated a series of anticompetitive actions to initially misappropriate certain intellectual property and other confidential information licensed to Careismatic (and Silverts CA as its subsidiary), and to subsequently engage in certain conduct to monopolize, or attempt to monopolize, the market for post-surgical, treatment and recovery wear garments targeted toward cancer patients, as well as other adaptive medical clothing generally for patients suffering from multiple medical conditions.

5.     Careismatic initially breached its licensing agreement with PTP by allowing its wholly-owned subsidiary, Silverts CA, to misappropriate the intellectual property and other confidential information licensed by PTP, in order for Silverts CA to develop its own post-surgical, treatment and recovery wear clothing line to compete with PTP, despite Silverts CA being included under the definition of "Licensee Group" within the licensing agreement.  Silverts CA was therefore bound by the same contractual obligations as Careismatic in promoting PTP's products and not creating a competing clothing line utilizing proprietary information licensed to them as part of the licensing agreement.

6.    Careismatic also breached its licensing agreement by not complying with the regular reporting requirements under the licensing agreement to PTP, and neglecting to regularly fulfill their contractual obligations to update PTP – and pay contractually-obligated Sales Royalties to PTP – in relation to total sales of products sold utilizing the licensed intellectual property and confidential information by PTP, as well as marketing campaign information.

7.    Careismatic and Silverts CA's respective breaches of the licensing agreement initially might be viewed as simple non-compliance – but other subsequent behavior by Careismatic and Silverts evidenced a coordinated course of conduct that constituted bad faith in deliberately trying to avoid fulfilling their contractual obligations to PTP, and also violating Chapter 93A of the Massachusetts General Laws.

8.    Careismatic ultimately went through a Chapter 11 bankruptcy reorganization that concluded in 2024, and part of its restructuring involved an employee buy-out of Silverts CA, allowing the former employees of Silverts CA to form as their own, separate, "spun off" legal entity, with separate equitable ownership, and Silverts DE was formed as a Delaware limited liability company on October 23, 2024.

9.    PTP came to learn from speaking directly with Careismatic in early March 2025 that the employee buy-out agreement consummated with the employees of Silverts CA included a non-competition clause, whereby, upon information and belief, Careismatic voluntarily agreed to not produce, sell, and/or market any post-surgical, treatment and recovery wear clothing line that could compete with Silverts DE producing, selling, and/or marketing the same, utilizing the misappropriated intellectual property and other confidential information PTP licensed to Careismatic.

10.    Upon information and belief, the non-competition clause agreed to between Careismatic and Silverts, despite being executed as part of an employee buyout, is unreasonable in its scope and geographic reach because it was a "blanket" non-competition provision that prohibited Careismatic from competing with Silverts DE, and was not narrowly-tailored or limited in its scope and geographic reach.

11.    By negotiating and agreeing to this unreasonably broad non-competition provision, Careismatic deliberately sought to shun and avoid fulfilling any of its contractual obligations to PTP under the licensing agreement to market similar products made with licensed intellectual property and confidential information by PTP, thereby constituting an additional breach of the licensing agreement, and exhibiting deliberate bad faith conduct in the process.

12.    Due to the presence of the non-competition provision in their employee buy-out agreement with Careismatic, Silverts DE effectively monopolized (or attempted to monopolize, as part of a conspiracy with Careismatic) the very specific market for post-surgical, treatment and recovery wear and clothing specific to breast cancer patients, which market was previously only occupied by PTP – who was merely the "first entrant" into the market – and also effectively attempted to monopolize the broader market for post-surgical, treatment and recovery wear products.

13.    While PTP is not immune from facing competition for its products (through the efforts of Careismatic promoting its products under the licensing agreement), it should not have had to face a competitor like Silverts DE who emerged under circumstances that were manifested by a misappropriation of its own confidential intellectual property – and then see the former employees of that competitor not have to face competition itself through an agreement with its former parent entity to not compete with a newly-formed entity.

4

14.    By executing the employee buy-out agreement with the non-competition clause running in its favor, Silverts DE tortiously interfered with the existing contractual relationship under the licensing agreement between PTP and Careismatic.

15.    As it relates to the employee buy-out agreement and the non-competition clause, Careismatic and Silverts DE committed violations of Chapter 93A by engaging in this unfair method of competition to effectively "take out" PTP and its products as a competitor (through Careismatic as its licensee).

16.    In addition to constituting a breach of contract by Careismatic – as well as a tortious interference with existing contractual relations by Silverts DE – and coordinated Chapter 93A violations of both Careismatic and Silverts DE – the non-competition clause of the employee buy-out agreement was also a contract placing a *per se* unreasonable restraint on trade in interstate commerce, thereby violating Section 1 of the Sherman Act, and was also a monopolization – or an attempt and conspiracy at monopolization – under Section 2 of the Sherman Act – and exhibited clear bad faith conduct by Careismatic.

17.    The non-competition clause is also potentially violative of Sections 1 and 2 of the Sherman Act when evaluated under a Rule of Reason, as it is not limited in scope or geographic reach, and in agreeing to such a clause: (i) Careismatic exhibited irrational economic conduct in not pursuing its own pecuniary self-interest to market and promote sales of PTP's licensed products, and (ii) the subsequent resulting monopolization of the post-surgical, treatment and recovery wear market within the "Territory" defined under the License Agreement was not the result of growth or development as a consequence of a superior product, business acumen, or historic accident by Silverts DE, but instead was the result of the unlawful conduct alleged herein.

## THE PARTIES

18.     Plaintiff, Patient To Person, LLC, is a limited liability company organized under the laws of the Commonwealth of Massachusetts with its principal place of business located in the Commonwealth of Massachusetts.

19.     Defendant, Careismatic Brands, LLC, formerly known as Strategic Partners, Inc., is a California limited liability company with its principal place of business located in the State of California.

20.     Defendant, Careismatic SV LLC, formerly known as Silverts Adaptive, LLC, is a California limited liability company with its principal place of business located in California.

21.     Defendant, Silverts Universal Dressing Solutions, Inc., is a Delaware corporation with its principal place of business located in Canada (together, Careismatic, Silverts CA, and Silverts DE shall be referred to hereafter as "Defendants").

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 1337(a) because it includes a request for adjudication of claim(s) that present a federal question, including under Section 4 of the Clayton Act, 15 U.S.C. § 15, for a private cause of action to recover treble damages and costs of suit, including reasonable attorneys' fees, against Careismatic and Silverts, for injuries sustained and to be sustained by PTP for violations, as alleged herein, of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 2 of the Sherman Act, 15 U.S.C. § 2, and also seeks equitable relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

23.     This Court has further jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1), respectively, because: (i) PTP, a Massachusetts limited liability company, as Plaintiff, asserts claims against each of Careismatic, a California limited liability company, Silverts

CA, a California limited liability company, and Silverts DE, a Delaware corporation, as Defendants, and therefore, there is complete diversity of citizenship between the Plaintiff and all of the named Defendants, and (ii) the amount in controversy between all parties exceeds the sum or value of $75,000.00, exclusive of interest and costs.

24.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and involve a common nucleus of operative fact. The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

25.    Both Careismatic and Silverts are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.

26.    This Court has personal jurisdiction over each of Careismatic and Silverts because each of Careismatic and Silverts has (i) systematically and continuously transacted substantial business in the Commonwealth of Massachusetts, (ii) has specifically engaged in conduct substantially affecting commerce within the Commonwealth of Massachusetts, (iii) engaged in conduct that was deemed to occur in the Commonwealth of Massachusetts and the specific causes of action against Careismatic and Silverts arise out of those contacts, and (iv) as it relates to the causes of action under the licensing agreement, each of Careismatic and Silverts contractually agreed to a forum selection clause ("Forum Selection Clause") that any "claim, dispute or disagreement with respect to the licensing agreement **shall** be brought **exclusively** in any Federal or state court located in Boston, Massachusetts having jurisdiction", and each of Careismatic and

Silverts irrevocably submitted "to the jurisdiction of the Federal and state courts located in Boston, Massachusetts…" (*emphasis added*).

27.     Venue in this District is proper based upon 15 U.S.C. § 22 because, among other reasons, Caresismatic and Silverts transact business in this District, and venue is also proper in this District based upon 28 U.S.C. § 1391(b)(3) because each of Careismatic and Silverts are otherwise subject to the Court's personal jurisdiction with respect to the causes of action alleged herein, specifically in light of their agreement to the Forum Selection Clause contained in the licensing agreement mandating all disputes thereunder be adjudicated by any "Federal and state court located in Boston, Massachusetts", and Careismatic's and Silverts' irrevocable submission thereunder "to the jurisdiction of the Federal and state courts located in Boston, Massachusetts."

**FACTS**

28.     PTP is a small Massachusetts limited liability company that designs and sells certain so-called "post-surgical and treatment clothing" and "recovery wear" products for patients across the medical spectrum with various physical disabilities, with a specialized focus on cancer patients.

29.     PTP's mission was borne out of a personal experience endured by its founding principal, Cathy McGrath ("Mrs. McGrath"), who herself experienced and survived a prior breast cancer diagnosis in the early 2000's at the age of 40.

30.     Mrs. McGrath endured multiple surgeries related to her cancer diagnosis, and specifically came up with the idea for the recovery clothing line after undergoing her third breast cancer surgery including mastectomy and reconstruction, from which she awoke to the cumbersome and uncomfortable feeling of having multiple, post-surgical drains inserted into her body.  Mrs. McGrath experienced physical aches, pains, and discomfort caused by the presence of

such post-surgical drains hanging loosely from the sites of her surgical incisions in order to collect pooled, bodily fluids.

31.    At the time of Mrs. McGrath's breast cancer diagnosis, no outer garment existed to hold post-surgical drains after a patient endured a mastectomy.

32.    The experience of enduring the post-surgical drains – and the increased weight they bore on her body as fluid build-up collected in such drains – led Mrs. McGrath to conceive of a clothing product to address this physical discomfort, and to simultaneously alleviate the mental discomfort for patients feeling helpless and a lack of control over their experience with the post-surgical process.  It was because of these experiences throughout breast cancer treatment that Mrs. McGrath initially conceived of, implemented, and ultimately executed a vision to sell clothing tailored to other patients undergoing treatment and recovery for a breast cancer diagnosis, and eventually, to a broader spectrum of patients, both male and female, experiencing other medical conditions and symptoms.

33.    To execute her vision, Mrs. McGrath spent a couple of years formulating how to manifest her ideas into a reality, and consulted as far back as 2004 with her friend and long-time business partner, Maureen Cardinal ("Mrs. Cardinal") about creating an entity that could provide a platform with which to assist cancer patients facing a diagnosis with the post-surgical, treatment, and recovery wear they needed.  As a product of those initial conversations and discussions, Mrs. McGrath initially formed a 501(c)(3) non-profit entity in October 2006 called "A Little Easier Recovery" ("ALER") with Mrs. Cardinal to distribute the post-surgical, treatment and recovery wear products she envisioned would be able to assist patients who were enduring – or successfully endured – a cancer diagnosis.   The plan for ALER was as pure and altruistic in nature as it could be to help similarly-situated cancer patients feel a little more comfortable, and to experience, as

the entity name implies, a little easier recovery in the post-surgical process related to a cancer diagnosis.

34.    In executing the vision, Mrs. McGrath applied for, and received, a utility patent from the United States government, US Patent# 8,302,214 B2 (November 6, 2012) ("US Patent"), as well as a patent from the Canadian government, Canadian Patent# 2,855,144 (December 5, 2017) ("Canadian Patent", and together with the US Patent, collectively, "Patents")), each of which protect certain unique and proprietary design elements related to the manufacture and production of breast cancer recovery garments in the post-surgical, treatment and recovery wear market.  In particular, Mrs. McGrath obtained patent protections for a design on a jacket that could hold multiple, post-surgical drains, provide one-handed dressing, reduce pain, and to restore a patient's dignity and independence, all to improve the quality of a patient's life overall.  Mrs. McGrath would eventually come to name this product the "Jacki", after thinking of what former First Lady Jacqueline Kennedy Onassis – commonly known as "Jackie O" – would wear herself if she had to endure such trauma.

35.    Mrs. McGrath also applied for and received a trademark for the mark "Jacki", Registration Number 2977936, related to hospital shirts for surgical and non-surgical breast cancer patients with pockets for drains ("Jacki"), and also received a trademark for the related mark "Jack", Registration Number 3055990, related to garments for use by surgical and non-surgical cancer patients ("Jack", and together with "Jacki", collectively, "Licensed Marks").

36.    Leading up to the formation of PTP, ALER successfully operated as a non-profit for over a decade from 2006 to 2019, and due to its non-profit status, was able to give away over thirty thousand (30,000) post-surgical treatment and recovery garments to those cancer patients who needed them through certain grant funding.  The quantities of garments distributed were based

upon grant funding success itself. The types of post-surgical treatment and recovery garments included multiple styles of the "Jacki", such as a variety of shirts and tops for women (both with and without snaps and/or Velcro), blouses and pants, the Men's "Jack" shirt, other clothing specific to men and children, as well as unisex tops and recovery pants that had a certain "tear-away" feature for added comfort, and additional "side snaps and/or Velcro" on the legging.

37.     The majority of the patients who received a garment received the Jacki garment specifically, but ALER also provided other tools to patients with the distribution of the garments, such as a Patient Organizer, as well as a booklet entitled "How to Get Through It" to assist patients with their recovery process.

38.     After multiple years of giving back to other cancer patients free of charge, witnessing the overwhelming growth and success of ALER and its products, and needing to ensure a viable source of money to secure their own personal retirements while also staying true to their original mission to help cancer patients in need, Mrs. McGrath sought to capitalize on the initial success of ALER by creating a new, for-profit entity and attempting to scale up its operations.

39.     PTP was ultimately formed with the Massachusetts Secretary of State subsequent to the issuance of the US Patent on February 2, 2016, and each of Mrs. McGrath and Mrs. Cardinal would play a major, vital role in the operations of PTP.

40.     The Canadian Patent was subsequently issued to Mrs. McGrath after formation of PTP.

41.     Sometime after issuance of both Patents and the registration of the Licensed Marks, and contemporaneous with the formation of PTP as a separate legal entity, Mrs. McGrath assigned the Patents and the Licensed Marks to PTP.

42.     After obtaining assignments of the Patents, PTP applied to the United States government in order to obtain a specific Healthcare Common Procedure Coding System (HCPCS) Medicare Code for their mastectomy product, the Jacki, so as to allow for this garment to be covered under Medicare reimbursement.

43.     The post-surgical recovery wear was so well-regarded that the non-profit entity, ALER, at its height of grant funding, was able to develop contacts and relationships with eighty-one (81) different hospitals nationwide, located across twenty (20) different states, to continue distributing the Jacki free to patients.

44.     Mrs. McGrath's recovery line designs garnered an overwhelming quantity of commendation and reviews from top breast cancer surgeons and oncology medical staff that even the Dana-Farber Cancer Institute ("DFCI") decided to conduct a clinical trial of the benefits provided by the recovery clothing garments ("Clinical Trial").  The Clinical Trial was conducted *gratis* by Dr. Mehra Golshan, Chief of Breast Cancer Surgery for DFCI at that time,[1] and lasted approximately four (4) years from June 2014 until completion in August 2018.

45.     As further evidence of the widespread popularity garnered by PTP for its unique breast cancer recovery garment, the American Cancer Society's cancer product catalog for November 2019 featured a placement for the breast cancer recovery garment marketed by ALER and PTP shortly after the Medicare Code was approved.

46.     The scale of initial success caused ALER to consider whether its thinly staffed setup, with a dedicated – but revolving – pool of volunteers, was sufficiently equipped to maximize

---

[1] Dr. Golshan is presently the Deputy Chief Medical Officer for Surgical Services at Smilow Cancer Hospital at Yale Medical Center, and the Executive Vice Chair of Operations in the Department of Surgery, as well as a professor of Surgical Oncology at the Yale School of Medicine.  Dr. Golshan's Clinical Trial of the Jacki is one of several positive reviews of the Jacki provided by leading experts in the specific fields of breast cancer research and surgical oncology.

– and capitalize upon – the popularity and well-received feedback for The Jacki, as well as some of its other recovery clothing designs.

47.    Throughout this period of success, Mrs. McGrath's role remained true to her core belief in creating ALER, and she never took a salary or wages from either entity – ALER or PTP – instead undertaking the role of "Chief Volunteer" for both entities to signify her unwavering commitment to placing patients and acquiring Medicare coverage above short-term pecuniary gain and profits.

48.    While awaiting approval of the Medicare coverage, PTP began discussions with Careismatic regarding PTP's multiple designs, leveraging the existence of the Patents and eventually the Medicare Code as key aspects of its sales plan.  PTP ultimately decided that the most successful way to achieve as wide a reach as possible to potential patients for its breast cancer products with its Licensed Marks, as well as its other post-surgical, treatment and recovery wear products, was to license the Licensed Marks and the Patents to a third party who possessed more resources for manufacturing, marketing and selling its licensed products.  This ultimately led to the beginning of its relationship with Careismatic.

### *License Agreement with Careismatic*

49.    Throughout 2019, PTP and Careismatic, whose name at the time was Strategic Partners, Inc. ("SPI"), engaged in numerous, good-faith negotiations over a potential licensing agreement of PTP's Licensed Marks and its Patents, leading to an initial letter of intent signed on or about October 1, 2019.

50.    PTP, as "Licensor", and SPI, as "Licensee", ultimately entered into and executed a certain License Agreement with one another, dated October 28, 2019 ("License Agreement").  *See* **Exhibit A**, attached hereto, License Agreement.

51.     The term of the License Agreement was for a ten (10) year period, commencing on January 1, 2020, and continuing through and concluding on December 31, 2030.

52.     On or about December 12, 2019, just before the commencement of the term for the License Agreement, SPI changed its legal entity name to Careismatic Brands, Inc., the immediate preceding legal entity name utilized by Careismatic, before making an additional subsequent change to its current name of Careismatic Brands, LLC.

53.     Section 1.1 of the License Agreement provides that "…Licensor hereby grants to Licensee an exclusive limited license to use the Licensed Marks and (to the extent applicable) the Patent in the Territory during the Term solely in connection with the manufacture, marketing, distribution and sale of Products approved by Licensor and solely by means of an Authorized Retailer." *See* **Ex. A**, § 1.1.  As defined by the License Agreement, the term "Territory" "has the meaning set forth in the introductory paragraph of this Agreement", which introductory paragraph defined "Territory" as referring to "…the United States, territories and possessions, and Canada…").

54.     Section 1.2 of the License Agreement provides as follows:

> "As used herein, the term '**Licensed Mark**(s)" shall mean the Registered Marks and any related additional marks, whether or not registered. The Licensed Marks along with all related approved images, logos and artwork are collectively referred to herein as the "Brand". "**Articles shall be sold under a trademark mutually approved by Licensor and Licensee, which may or may not utilize the Licensed Mark(s), but shall in all events *be included for purposes of the Sales Royalty*.**" Each mutually approved trademark (including any variations and stylized forms thereof) under which Articles are sold hereunder shall be deemed to be a Licensed Mark. For clarification, the particular mark Licensed Mark(s) to be used, and the form thereof, including each variation and stylized form thereof, shall be subject to Licensor's prior written approval. Notwithstanding anything to the contrary contained in this Agreement, Licensor reserves all rights to the Licensed Marks except those that are granted specifically to

14

Licensee, and Licensor may exercise such rights at any time." *See* **Ex. A**, § 1.2 (*emphasis added*).

55.    Schedule C to the License Agreement clearly and unequivocally delineated the

products being licensed by PTP to Careismatic:

> "Solely the following medical/health care products marketed and sold as post-surgery recovery products, along with non-surgical garments:
>
> Jacki with prosthetic (multiple styles, with and without removable prosthetic bra)
> Prosthesis inserts/forms/puffs
> Jacki without prosthetic (multiple styles)
> Children's shirt (multiple styles)
> Children's pants (multiple styles)
> Men's shirt (multiple styles)
> Men's slacks/pants (multiple styles)
> Undergarments (men's and women's)
> Camisole".  *See* **Ex. A**, **Schedule C**, attached thereto ("Licensed Products").[2]

56.    With respect to Careismatic's obligation to market and exploit the Licensed

Products, Section 1.3 of the License Agreement further states as follows:

> "Licensee shall use its ***best efforts*** to develop and promote all Articles, to exploit the rights granted to it throughout the Term throughout the Territory and ***vigorously*** to promote the sale of Articles consistent with the high standards, image and prestige of the Brand. The Parties acknowledge and agree that the Articles shall (a) be of high quality for comparable medical/healthcare Products and (b) employ designs, materials, styles, workmanship that at all times reflect the foregoing ((a) and (b) collectively, (the "Brand Standard"). It Is of the essence of this Agreement that the Articles are at all times designed, developed, produced, manufactured, distributed, sold, advertised and promoted in accordance with the Brand Standard and that Licensee exercise its rights and extends its best efforts to perform its obligations hereunder in a professional manner at all times." *See* **Ex. A**, § 1.3 (*emphasis added*).

---

[2] The "Articles" referred to in the License Agreement are also the "Licensed Agreements", as defined by this Complaint, and as listed on Schedule C to the License Agreements.  They are initially defined as "Products" broadly – but if sold pursuant to the License Agreement specifically, they are referred to as "Articles".

57.    Section 7.1 of the License Agreement put a further onus and contractual obligation upon Careismatic to use "best efforts" to "maximize the advertising, marketing and promotion" of the Licensed Products.  *See* **Ex. A**, § 7.1.

58.    Section 13.1 of the License Agreement additionally re-iterates the principal that (outside of Licensee Marks), "…any other intellectual property right…" created pursuant to the Agreement (inclusive of so-called "Packaging Materials" and "Marketing Materials", including photographs, designed or approved by PTP, as Licensor), "shall be, as between Licensor and Licensee, ***the exclusive property of Licensor"***.  *See* **Ex. A**, § 13.1 (*emphasis added*).

59.    Section 14.1 of the License Agreement, entitled "Confidentiality and Non-Competition", additionally provides:

>        "All information relating to the business, operations and personnel of Licensor or any of its affiliates, including Brand, that Licensee learns or has learned during or prior to the term of this Agreement, including all financial information and business plans relating to the business of Licensor or any of its affiliates, all concepts, design components and marketing, advertising and promotional concepts and plans that Licensor provides to Licensee or that Licensor approves for use in connection with Articles and all personal information regarding Brand ("Confidential Information"), is the valuable property of Licensor.  Licensee acknowledges the need to preserve the confidentiality and secrecy of the Confidential Information.  Therefore, during the term of this Agreement and thereafter, neither Licensee nor any member of the Licensee Group shall use or disclose any of the Confidential Information, except for such use by or behalf of Licensee that is permitted under this Agreement.  Licensee shall take all steps reasonably necessary to ensure that it and those acting on its behalf, including the members of the **Licensee Group**, the Contractors and its suppliers, shall preserve the confidentiality and secrecy of the Confidential Information.  Licensee shall notify Licensor promptly after learning of any misuse or unauthorized disclosure of any Confidential Information.  The provisions of, and the obligations of Licensee and the members of the Licensee Group under, this Section 14.1 shall survive the Termination". *See* **Ex. A**, § 14.1.

60.    The term "Licensee Group" was defined under the License Agreement as having the meaning set forth In Section 12.2, which defined "Licensee Group" to mean "Licensee's

**_affiliates_** and any of the respective managers, officers, directors, members, shareholders, owners, employees and agents of Licensee or any of its affiliates…". *See* **Ex. A**, § 12.2 (*emphasis added*). The plain and ordinary meaning of the term "affiliates" would include wholly-owned subsidiary entities of Careismatic, which would've included Silverts CA at the time of execution of the License Agreement.

61.     For the purposes of paying royalties to PTP, Section 9.1, entitled "Minimum Royalty", required Careismatic, as Licensee, to make certain non-refundable, guaranteed royalty amounts to PTP, as Licensor based upon its sales output of the Licensed Products. *See* **Ex. A**, § 9.1.  During the time between the "First Annual Period" and continuing through the "Fifth Annual Period",[3] or January 1, 2020 through December 31, 2024, required a minimum royalty payment from Careismatic to PTP in the amount of no less than $35,000.00, with such payments to be made semi-annually on or before January 20th and July 20th of each Annual Period. *See* **Ex. A**, § 9.1.

62.     Based upon Section 9.1, the combined minimum royalty payments owed by Careismatic to PTP during the first five (5) years of the Term of the License Agreement was therefore no less than $175,000.00.

63.     Section 9.2 of the License Agreement further provided a financial incentive for Careismatic to recoup the minimum royalty payments made to PTP if it were able to obtain enough sales output, such that the minimum royalties owed could be credited against the sales royalties that actually accrued to Careismatic during the same Annual Period until such time (if ever) "as such Minimum Royalty is fully recouped".  *See* **Ex. A**, § 9.2.

---

[3] As defined in Section 2.3 of the License Agreement, "Annual Period" referred to "the period from the date hereof through December 31, 2030 and each one-year period thereafter commencing on January 1 during the term of this Agreement is called an 'Annual Period.'".

64.    Careismatic was also incentivized to maximize its sales output during the first five (5) years of the term of the License Agreement because Section 9.2 also provided that "No unrecouped portion of the Minimum Royalty for any Annual Period shall be carried over or otherwise credited or offset against Sales Royalties that accrue during any prior or subsequent Annual Period." *See* **Ex. A**, § 9.2.

65.    Careismatic was further incentivized due to the fact that Section 9.2 prohibited offset or credit for any so-called "Sales Royalties" that actually accrued to Careismatic during each Annual Period that exceeded the "Minimum Royalty" for that particular Annual Period, and such "Sales Royalties" could ***not*** be credited or otherwise offset against any "Minimum Royalty" for any prior or subsequent Annual Period.

66.    Thereafter, during the "Sixth Annual Period" and continuing through the conclusion of the "Tenth Annual Period" under the License Agreement, no such minimum royalty payments were required to be made. *See* **Ex. A**, § 9.1.

67.    For all Annual Periods during the term of the License Agreement – irrespective of whether an "Annual Minimum Royalty" was owed by Careismatic to PTP – Careismatic was required to pay additional "Sales Royalties" ("Sales Royalties") to PTP during each Annual Period.

68.    Section 10 of the License Agreement provided that, as it pertained to the first $5,000,000.00 worth of "Net Sales" during each Annual Period, Careismatic was obligated to pay PTP "a royalty equal to five percent (5%) of Net Sales for first quality sales and…three percent (3%) for second quality/off-price sales…during the Term (the "Sales Royalty").". *See* **Ex. A**, § 10.1. If "Net Sales" exceeded $5,000,000 during any of the Annual Periods, then Careismatic was also obligated to pay further Sales Royalties to PTP equal to three percent (3%) of Net Sales for all products, first and second quality/off-price sales. *Id.* Careismatic was further obligated to make

18

additional payments of Sales Royalties to PTP for any "product derivatives which utilize the Patent[s] for post-surgery recovery and treatment wear.". *Id.*

69.    Pursuant to Section 10.2 of the License Agreement, the term "Net Sales" was defined as follows:

> "The term **"Net Sales,"** as used in this Agreement, means the gross amounts invoiced or charged for all Articles sold or shipped by Licensee during the applicable period, less only (i) the amount of any discounts actually earned and taken by customers (but not discounts for prompt payments, including "anticipation" discounts), any markdown allowances (including so-called "point of sale markdown allowances) and any authorized returns (provided that "Net Sales" shall include the regular wholesale price of any Articles shipped to a customer in exchange for returned Articles), but only to the extent that such discounts, markdown allowances and returns during an Annual Period **do not exceed in the aggregate five percent (5%) of gross sales during such Annual Period**. No deduction shall be made for other discounts, allowances (including, but not limited to, allowances for co-op advertising or merchandising displays), uncollectible accounts or costs incurred by Licensee.  Net Sales shall also include insurance proceeds received by Licensee in respect of Articles.  Sales or other transfers of Articles not in arm's length transactions shall be deemed to be sales made at the regular wholesale prices of such Articles; provided, however, that any retail sales by Licensee to a consumer, whether made directly or indirectly through an affiliate (including any affiliated ecommerce website), would be valued at the consumer price for purposes of calculating the Net Sales." *See* **Ex. A**, § 10.2.

70.    The payments of Sales Royalties were to be paid as follows:

> "The Sales Royalty hereunder shall be accounted for and **paid *quarterly within 45 days* after the close of each March, June, September and December during the Term of this Agreement (or portion thereof in the event of prior termination for any reason)**, except that, for the for the First Annual Period, the first such accounting and payment shall be for the period commencing as of the date hereof and continuing through the end of the first calendar quarter in which Articles are invoiced or shipped (whichever is earlier).  The Sales Royalty payable for each calendar quarter during each Annual Period (each a "**Quarterly Payment**") shall be computed on the basis of Net Sales during such Annual Period, with a credit for the Minimum Royalty theretofore made to Licensor for said Annual Period, as applicable." *See* **Ex. A**, § 10.3.

71.     As a further contractual obligation owed to PTP, in connection with each Quarterly Payment of Sales Royalty owed, Careismatic was obligated to deliver to PTP a "Quarterly Statement" for the just-completed calendar quarter and the Annual Period-to-date, that detailed, among other things: (i) the number and invoice prices of all Articles invoiced or shipped by Licensee to customers in arm's length transactions, the amount of discounts, allowances and returns that properly may be deducted from gross sales and Net Sales, all by country, by Article and by customer; (ii) the number, invoice prices and regular wholesale prices of all Articles invoiced or shipped by Licensee to customers other than in arm's length transactions, all by country, by Article and by customer; (iii) the amount of any insurance proceeds received by Licensee in respect of Articles; and (iv) the regular wholesale prices of Articles given away by Licensee to a charity.  Careismatic was also obligated, either upon request by PTP, or within thirty (30) days after the end of each Annual Period, to deliver a report detailing Careismatic's advertising and promotional activities in connection with the Products, including detailed expenditures on so-called "Marketing Activities".  *See* **Ex. A**, § 11.2.

### ***Initial Breaches under the License Agreement by Careismatic***

72.     Despite the many contractual obligations owed by Careismatic to PTP under the License Agreement (operating under its former legal name of Strategic Partners, Inc. and Careismatic Brands, Inc.), Careismatic's actions and conduct have fallen woefully short of fulfilling these obligations, and exhibit a pattern of either deliberate indifference, or conduct demonstrative of bad faith.

73.     At no point during ***any*** of the prior twenty-four (24) fiscal quarters where the License Agreement has been in effect, from January 1, 2020 through the date of the filing of this Complaint, has Careismatic made a single penny worth of its contractually-obligated payments of

20

Sales Royalties based off original PTP designs listed in Schedule C to the Licensing Agreement to PTP in accordance with the provisions of Sections 9.2, 10.1, 10.2, and 10.3.

74.     PTP subsequently came to learn that, instead of utilizing "best efforts" to market the post-surgical, treatment and recovery wear clothing line products licensed to them, and to pay the required Sales Royalties to PTP, Careismatic covertly – and deceptively – began laying the groundwork for forming its own competing recovery clothing line by utilizing the proprietary information licensed to it by PTP, with the explicit intention of not paying any Sales Royalties to PTP associated with the sales of Careismatic's own recovery clothing line products.

75.     Beyond the initial breaches of not paying the above-referenced Sales Royalties, Careismatic has also failed to repeatedly comply with its reporting requirements under Section 11, having only provided a total of five (5) Quarterly Statements to PTP, instead of the required twenty-four (24) Quarterly Statements they should have provided PTP to date. The only Quarterly Statements received to date by PTP were for July 28, 2020, December 14, 2020, April 13, 2021, October 12, 2021, and April 21, 2022.

76.     Careismatic has also failed to provide PTP with the five (5) required annual reports to date for each of calendar years 2020, 2021, 2022, 2023, and 2024, each of which was due within thirty (30) days after the end of each such Annual Period.

77.     Each of the Quarterly Statements and annual reports were meant to be progress checkpoints for Careismatic and PTP to determine the best ways to effectively maximize and exploit the products for sale in the market, and also to provide a level of transparency and disclosure between the parties as to the Sales Royalties that would be owed by Careismatic to PTP based upon a full, fair, accurate, and transparent accounting of all sales made by Careismatic on PTP's behalf in marketing the recovery clothing line products.  Instead of complying with these

reporting requirements, Careismatic's conduct to date demonstrates they have deliberately withheld and not provided such accounting information to PTP, and exhibited bad-faith, voracious, and greedy corporate conduct in relation to acting in PTP's best interest as its licensee.

78.    Despite numerous attempts and communications by PTP and its Founders with Careismatic to obtain contractually-obligated reporting requirements for Quarterly Statements and annual reports, Careismatic has continued to either: (i) willfully disregard its contractual obligations by deliberately delaying, hindering, and avoided providing such reports pertaining to the royalites of the expanded, competing line of recovery wear products that Careismatic derived from original designs listed in Schedule C to the License Agreement, which was done as a means of preventing PTP from receiving what it is owed pursuant to the License Agreement, or (ii) at a bare minimum, even if not done deliberately, it has nonetheless breached the License Agreement with PTP based upon not providing such royalty payments and such reporting as it relates to the competing product line.

79.    Careismatic also did not utilize its "best efforts" to develop and promote the Licensed Products "vigorously" throughout the required "Territory", as it was required to do under Section 1.3 of the License Agreement, nor has it used its "best efforts" to "maximize the advertising, marketing and promotion" of the Licensed Products.

### *Breach of Confidentiality and Non-Competition by*
### *Careismatic and its Wholly-Owned Subsidiary, Silverts CA*

80.    Despite the non-compliance by Careismatic with the contractual obligations for (i) paying quarterly and semi-annual royalties of the expanded line derived from original designs listed in Schedule C to the License Agreement, (ii) submitting timely reporting on a quarterly and annual basis, and (iii) failing to use best efforts to vigorously promote PTP's Licensed Products, such breaches pale in comparison to another breach committed by Careismatic: permitting its

wholly-owned subsidiary at that time (Silverts CA) to utilize the Confidential Information so licensed by PTP to develop a competing clothing line in direct violation of Section 14.1 of the License Agreement.

81.     For nearly two (2) years subsequent to the execution of the License Agreement, and wholly separate and apart from the reporting obligations owed by Careismatic, PTP repeatedly requested Careismatic/Silverts CA to provide it with certain high-level strategies and plans as to items such as merchandising, a marketing plan, sourcing/pricing, design expertise, a launch, product feature video, and photography with a model of items to be marketed and sold.  Each time PTP requested such information, Careismatic/Silverts CA unduly delayed providing such information, and did not provide any information related to the above-referenced items requested by PTP.  Therefore, limited to no marketing was implemented.

82.     The lack of communication from Careismatic to PTP exhibited an indifference to Careismatic's contractual obligations to PTP to pursue marketing and promotion of the Licensed Products with the required vigorousness mandated by the License Agreement.

83.     Sometime in September 2021, Silverts CA was selling its own competing "recovery wear" clothing line on its website. Silverts CA did not ever previously market or sell such a clothing line prior to Careismatic (its sole owner and parent entity at the time) executing the Licensing Agreement with PTP.  While Silverts CA may have sold certain post-surgical or treatment clothing prior to Careismatic's execution of the License Agreement, it never previously sold a product that it labeled or identified as "recovery wear" clothing specifically.

84.     Specifically, certain reviews posted by "Verified Buyers" on Silverts' website showed reviews for the following recovery line products derived from PTP designs listed in Schedule C to the License Agreement:

Women's Adaptive Post-Surgical Top With Snaps (Best Seller)_Item #61000
Women's Tearaway Post-Surgery Recovery Pant (Best Seller)_Item #61010
Women's Post Surgery Recovery Pant Item #607
Women's Post Surgery Adaptive Recovery Blouse Item #608
Women's Post Surgery Zipper Closure Recovery Top Item #618
Women's Post Surgery Side Zip Recovery Pant Item #619
Women's Post Surgery Multi- Zip Recovery Pant Item #605
Women's Post Surgery 1/4 Zip Recovery Top Item #604
Women's Post Surgery Adaptive Recovery Nightgown Item #616
Men's Zippered Post Surgery Recovery Top Item #609
Men's Zippered Post Surgery Recovery Pant Item #610
Men's Post Surgery Recovery Nightgown Item #614
Unisex Tear-Away Post Surgery Pant Item #622
Unisex Tear-Away Post Surgery Top Item #621

(collectively, the "Competing Silverts Products")

85.    The Competing Silverts Products bore a striking resemblance to the post-surgical, treatment and recovery wear garments initially produced and licensed to Careismatic of the multiple original designs provided by PTP.

86.    In follow-up to learning about Silverts advertising the Competing Silverts Products on its website, PTP continued to inquire to Careismatic about better ways to market the Licensed Products to maximize and exploit them, as Careismatic was contractually-obligated to do.  Despite numerous and repeated attempts by PTP to obtain marketing and promotional materials from Careismatic, as well as an overall, general strategy of any kind, Careismatic showed no interest in providing such materials to PTP, or providing sufficient communication to PTP about its plans and "best efforts" to market and exploit the Licensed Products.

87.    PTP concluded that because Silverts CA was advertising and marketing for sale its own "recovery wear" line similar to the Licensed Products (where it never previously sold such items), Careismatic was sharing the "Confidential Information" licensed under the License Agreement with Silverts CA (its wholly-owned subsidiary).  By itself, this conduct was permitted

24

under the License Agreement as long as it was used to promote and market the Licensed Products of PTP, and to pay Sales Royalties to PTP associated with any sales of competing goods manufactured with the Confidential Information provided.

88.    PTP was inherently relying on Careismatic and its larger array and network of resources to determine the best path forward for exploiting its products, including, among other things, if Careismatic ultimately determined that the most effective manner of doing so was to create a new line of products not previously sold by either of ALER or PTP utilizing the Confidential Information shared by PTP with Careismatic pursuant to the License Agreement. Thus, in PTP's view, as long as Careismatic paid its contractually-obligated Sales Royalties to PTP, Careismatic's creation and manufacture of a new clothing line utilizing the Confidential Information shared by PTP – by itself – was *not* a breach of the License Agreement, and PTP shared this view with Careismatic on multiple occasions in subsequent discussions that occurred after the Competing Silverts Products were created. However, after Careismatic's continued failure to provide documentation around, and pay royalties for, the Competing Silverts Products, and a failure to provide marketing plans for the Licensed Products, it would later become clear to PTP through discussions with Careismatic that their intent was not to pay the contractually owed royalties for the Competing Silverts Products, but to evade their contractual obligations and enable Silverts to misappropriate PTP's Confidential Information.

89.    The sharing of this Confidential Information, however, to allow Silverts CA to create its own competing clothing line through the Competing Silverts Products (and not pay royalties back to PTP for the sales of such products), breached the non-competition provisions of the License Agreement, both for Careismatic as the parent company (under its former name,

Strategic Partners, Inc.), and for Silverts CA, as the wholly-owned subsidiary of Careismatic at that time.

90.     As a member of the "Licensee Group" under the License Agreement – specifically as an "affiliate" of Careismatic due to its subsidiary status – Silverts CA was bound by the same confidentiality and non-competition provisions as Careismatic was.

91.     The misappropriation of the Confidential Information by Silverts CA to develop, create, and market for sale a competing clothing line for products it never previously sold, prior to Careismatic's execution of the License Agreement, in addition to being a breach of contract, and a breach of good faith and fair dealing, also demonstrates an unfair or deceptive trade act or practice in violation of Chapter 93A of the Massachusetts General Laws by each of Careismatic and Silverts CA.

92.     In permitting Silverts CA to misappropriate the Confidential Information for its pecuniary gain, Careismatic further breached Section 14 of the License Agreement for its failure to take all steps reasonably necessary to ensure that it and those acting on its behalf (including members of the Licensee Group, such as Silverts CA) would preserve the confidentiality and secrecy of the Confidential Information.

*__Bankruptcy and Non-Dischargeability of PTP's Unsecured Debt__*

93.     On or about October 28, 2022, Careismatic officially changed its legal entity name from Careismatic Brands, Inc. to its present legal entity name of Careismatic Brands, LLC and also converted its entity structure from a California corporation to a California limited liability company.

94.    Thereafter, on or about January 22, 2024, Careismatic filed a Chapter 11 Voluntary Petition with the United States Bankruptcy Court for the District of New Jersey (Newark), Docket Number #: 24-10561-VFP.

95.    While PTP did receive actual notice of the bankruptcy proceedings, PTP was not listed on the creditor labeling matrix of all creditors entitled to receive notice at any point during the pendency of the Chapter 11 bankruptcy proceedings.

96.    11 U.S.C. § 523, entitled "Exceptions to Discharge", provides as follows:

"(a) A discharge under section…1141…of this title does not discharge an individual debtor from any debt…

(3) neither listed nor scheduled under Section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit…

(A) if such debt is not of a kind specified in paragraph (2), (4) or (6) of this subsection, *timely filing of a proof of claim*, unless such creditor had notice or actual knowledge of the case in time for such timely filing…". *See* 11 U.S.C. § 523(a)(3)(A) (*emphasis added*).

97.    The debt owed by Careismatic to PTP – in the form of Sales Royalties derived from sales of the Licensed Products by Silverts CA, its wholly-owned subsidiary – is not "of a kind" specified in paragraph (2), (4), or (6) of 11 U.S.C. § 523.

98.    While PTP did have actual notice and knowledge of the Chapter 11 bankruptcy proceedings from Careismatic in such time so as to make a timely filing of a proof of claim in the bankruptcy proceedings, thereby avoiding prejudice in its ability to present its claim, the initial mistake by Careismatic in leaving PTP off of the associated creditor labeling matrix ultimately led to a material set of circumstances through which PTP unearthed Careismatic's and Silvert's CA's conspiratorial conduct and cooperation with one another to avoid paying Sales Royalties to PTP under the License Agreement.

99.    During the pendency of the Chapter 11 bankruptcy proceedings, the Bankruptcy Court for the District of New Jersey issued an Order confirming the Chapter 11 reorganization plan of Careismatic ("Reorganization Plan"), thereby invoking the discharge provisions of Section 1141 of the Bankruptcy Code, 11 U.S.C. § 1141, and operating as a discharge to debts incurred by Careismatic prior to the confirmation date of the Reorganization Plan.

100.    Despite the order related to the Reorganization Plan, as detailed further herein, Careismatic's own conduct in failing to provide a key notice to PTP now finds that PTP's unsecured claim against Careismatic for unpaid Sales Royalties survived the termination of the Chapter 11 bankruptcy.

### *Antitrust Violations*

101.    As part of the Chapter 11 bankruptcy process, Careismatic sought to restructure its organizational umbrella among its varied and diverse holdings in subsidiary and affiliate entities.

102.    Upon information and belief, as part of its organizational restructuring during the Chapter 11 bankruptcy process, Careismatic executed and entered into an employee buy-out agreement with its wholly-owned subsidiary, Silverts CA, whereby several former employees of Silverts CA left the entity and ultimately formed their own, separate legal entity that was 100% equitably owned by the former employees ("Buy-Out"), thereby effectuating a *de facto*, but not *de jure*, divestiture.

103.    In connection with the Buy-Out, Silverts DE was formed as an independent Delaware corporation on October 23, 2024.  Silverts CA also subsequently changed its legal name as an entity on or about February 19, 2025 to its current name, Careismatic SV LLC.

104.    Upon information and belief, as part of the Buy-Out, Careismatic agreed to a non-competition clause ("Non-Compete") in favor of Silverts DE, whereby Careismatic agreed not to

compete with Silverts DE in the post-surgical, treatment and recovery wear market, a new market that previously only had one (1) entrant, PTP. The Buy-Out also sold all recovery wear inventory to Silverts.

105.    Upon information and belief, despite not having seen the actual terms and conditions of the Non-Compete, PTP believes that the Non-Compete is unlimited in scope and geographic reach, and encompasses the same geographic market as the defined term "Territory" under the License Agreement.

106.    As a result of the Buy-Out, the post-surgical, treatment and recovery wear market thus expanded from one (1) entity to two (2) entities: PTP and Silverts DE, with the marketing, promotion, and sale of PTP's Licensed Products by Careismatic being prohibited due to the presence of the Non-Compete.

107.    In agreeing to the Non-Compete in favor of Silverts DE, Careismatic either recklessly, or willfully, disregarded its existing contractual obligations to PTP under the License Agreement, thereby refusing to utilize "best efforts" to "vigorously" promote PTP's Licensed Products, and in the process exhibit bad faith conduct towards PTP.

108.    The agreement to the Non-Compete between Careismatic and Silverts DE as part of the Buy-Out was a contract placing an unreasonable restraint on trade in the post-surgical, treatment and recovery wear market, thereby effectuating not only a method of unfair competition against another horizontal competitor in PTP, but manifesting an injury to competition more broadly through the exhibition of anti-competitive behavior in this narrow market.

109.    Due to the Non-Compete, Silverts DE effectuated a monopolization of the post-surgical, treatment and recovery wear market – or attempted to do so – at a minimum.

110.    Because Careismatic was an existing party to the License Agreement, the injuries suffered by PTP were direct injuries because PTP was relying on Careismatic to "vigorously" market and promote its Licensed Products utilizing its "best efforts".

111.    The injuries sustained by PTP due to the Non-Compete between Careismatic and Silverts DE are uniquely the type of injury the antitrust laws were designed to protect, as PTP is a direct competitor in the post-surgical, treatment and recovery wear market.

112.    PTP is the "best first" party to bring this action due to the direct nature of the injuries suffered pursuant to the License Agreement, and the unique antitrust injuries it suffered as a competitor in the post-surgical, treatment and recovery wear market.

113.    Further, by agreeing to the Non-Compete in its favor, and by consummating the Buy-Out with the subsequent formation of a legally separate and distinct entity, Silverts DE tortiously interfered with the existing contractual relationship under the License Agreement between Careismatic and PTP by obtaining an agreement from Careismatic to fundamentally breach and disregard its existing contractual duties owed to PTP under the License Agreement. Upon information and belief, Silverts DE continues to utilize the Confidential Information previously misappropriated by Silverts CA to market and promote its post-surgical, treatment and recovery wear products in a market it monopolized – or attempted to monopolize – and where it has nearly 100% market share currently through sales of the Competing Silverts Products.

114.    As recently as March 2025, PTP learned that Silverts DE removed the "Jacki" from its recovery wear line of its website as a product to be sold, and is currently only selling it's own post-surgical, treatment and recovery wear products – that being the Competing Silverts Products – utilizing the misappropriated Confidential Information from the License Agreement.  Due to the

Non-Compete, Careismatic is also currently not pursuing any sales of the Jacki, thereby effectively "freezing out" any competition from PTP in this narrow market.

115.    PTP first learned of the presence of the Non-Compete on or about March 3, 2025 in an email from one of Careismatic's executives, Mike McCarthy, who indicated to Mrs. McGrath that after checking with the Careismatic legal team, "and as a result of the sales of Silverts we have a non-compete that would not allow us to produce adaptive clothing.  I am happy to make introductions needed either with the Silverts group or if needed recommendations on other manufacturers."  This was the first moment in PTP's relationship with Careismatic where it became abundantly evident and clear to PTP that Careismatic was discreetly operating in breach of the contract dating back to its first posting of the Competing Silverts Products on its website in September 2021, despite there being no reasonable basis for PTP, or any other similarly-situated reasonable person to know, at that time, that such an act was the beginning of Careismatic's anti-competitive and bad faith conduct towards PTP in direct breach of the License Agreement.  Thus, PTP only first uncovered – or became fully and cognizantly aware of – Careismatic's scheme as of March 3, 2025.

116.    On or about April 15, 2025, during a call with Careismatic's lawyers, Careismatic stated to PTP – and PTP learned for the very first time – that the License Agreement was purportedly rejected in the Chapter 11 bankruptcy proceedings, thereby terminating the License Agreement.  In making this claim, Careismatic indicated to PTP that it would look into confirming the rejection of the License Agreement as part of the Chapter 11 bankruptcy, but has yet to produce any evidence, or had any follow-up communication, regarding such confirmation for over six (6) months.

117.    Despite the alleged belief that the License Agreement was terminated, PTP represented to Careismatic's lawyers on that same phone call that PTP never received any notice of a motion, or any other filing, from either Careismatic, or the United States Bankruptcy Trustee, that either party was seeking to terminate or reject the License Agreement as part of the Reorganization Plan.  At no time during the pendency of the bankruptcy did any person, employee, servant, attorney, or agent on behalf of PTP ever receive any notice related to the rejection or termination of the License Agreement so as to provide an opportunity for PTP to object to the same and to appear in the bankruptcy proceedings to contest such a motion.

118.    Due to its lack of receiving notice of any motion related to the rejection or termination of the License Agreement by either Careismatic, or the United States Bankruptcy Trustee, and due to the lack of the Trustee's cure of the existing defaults of Careismatic in not paying the Sales Royalties (for the competing product line and any amounts above the Minimum Royalty that were unable to be identified due to the lack of Quarterly Statements) to PTP *prior* to rejecting the License Agreement, as required by the United States Bankruptcy Code, PTP asserts that its claims against Careismatic ultimately were not discharged pursuant to the language of the Reorganization Plan, as well as the provisions of 11 U.S.C. § 365, et seq., and thus survived the termination of the bankruptcy proceedings themselves, remaining active and enforceable to this day.

119.    Once Silverts DE became its own separate legal entity, Careismatic further breached the provisions of Section 4.2 of the License Agreement for failing to enter into an agreement with Silverts DE as a "Contractor" to ensure that Silverts DE continued to abide by the Code of Conduct (relating to misuse of the Licensed Products) attached to the License Agreement

that applied previously to Silverts CA when it was a subsidiary of Careismatic under the definition of "Licensee Group".

## COUNT I
### (Breach of License Agreement – Careismatic)

120.    The allegations contained in paragraphs 1-119 are hereby restated and re-incorporated as if fully set forth herein.

121.    Pursuant to the License Agreement, Careismatic was obligated, among other things: (i) to pay Sales Royalties to PTP on a quarterly basis, (ii) to prepare and provide timely Quarterly Statements and reports, as well as annual reports, containing the information required by the License Agreement, (iii) to use "best efforts" to "vigorously" develop, promote, and sell PTP's Licensed Products, (iv) to use "best efforts" to maximize the "advertising, marketing, and promotion" of PTP's Licensed Products, and (v) to take all steps reasonably necessary to ensure that it and those acting on its behalf (including members of the Licensee Group, such as Silverts CA) would preserve the confidentiality and secrecy of the Confidential Information and not permit a breach of the non-competition provision in the License Agreement.

122.    Careismatic failed to fulfill each of these contractual obligations, among others, and thereby breached Sections 1.3, 4.2, 7.1, 9.1, 9.2, 10.1, 10.2, 10.3, 11.1, and 14.1 of the License Agreement.

123.    As a direct and proximate result of Careismatic's various breaches of the License Agreement, PTP has suffered injury to its business and property and seeks damages in an amount to be proven at trial, but in excess of the jurisdictional amount of this Court under 28 U.S.C. § 1332(a).

## COUNT II
### (Breach of License Agreement – Silverts CA)

124.    The allegations contained in paragraphs 1-123 are hereby restated and re-incorporated as if fully set forth herein.

125.    Due to its status as an "affiliate", wholly-owned subsidiary entity of Careismatic, Silverts CA was encompassed within the group of parties included in the definition of the term "Licensee Group" under the License Agreement.

126.    As a member of the "Licensee Group" under the License Agreement, Silverts CA was obligated to abide by the confidentiality and non-competition provisions of Section 14.1, and to ensure the confidentiality and secrecy of the Confidential Information disclosed and licensed by PTP to Careismatic.

127.    Silverts CA misappropriated the Confidential Information for its own pecuniary gain in utilizing such information to actively develop and market its own competing post-surgical, treatment and recovery wear product line, despite being obligated not to do so under the License Agreement.

128.    In misappropriating the Confidential Information licensed under the License Agreement, and utilizing such information for its own economic interest, Silverts CA breached the confidentiality and non-competition provisions of Section 14.1 of the License Agreement.

129.    As a direct and proximate result of Silverts CA's breach of Section 14.1 of the License Agreement, PTP has suffered injury to its business and property and seeks damages in an amount to be proven at trial, but in excess of the jurisdictional amount of this Court under 28 U.S.C. § 1332(a).

## <u>COUNT III</u>
**(Breach of Covenant of Good Faith and Fair Dealing – Careismatic)**

130.    The allegations contained in paragraphs 1-129 are hereby restated and re-incorporated as if fully set forth herein.

131.    The covenant of good faith and fair dealing is implied in every contract.

132.    In performing their respective contractual obligations, neither party to a contract may do anything which would have the effect of destroying or injuring the right of the other party to receive the "fruits of the contract", and a breach of this covenant occurs when one party violates the reasonable expectations of the other.

133.    The breach by Careismatic of its non-payment of Sales Royalties owed to PTP, coupled with failure to comply with regular reporting requirements under the License Agreement, demonstrate evidence of a lack of good faith – and potentially bad faith conduct – on the part of Careismatic to fulfill its contractual obligations pursuant to the License Agreement.

134.    Further, the deliberate agreement to the Non-Compete by Careismatic in favor of Silverts DE – thereby completely disregarding and prohibiting itself from fulfilling its existing contractual obligations owed to PTP – was an act lacking in good faith that had the effect of "destroying or injuring the right" of PTP to receive the "fruits of the contract" under the License Agreement.

135.    As a direct and proximate result of Careismatic's breach of the covenant of good faith and fair dealing, PTP has suffered injury to its business and property and seeks damages in an amount to be proven at trial, but in excess of the jurisdictional amount of this Court under 28 U.S.C. § 1332(a).

## COUNT IV
### (Violation of M.G.L. ch. 93A – All Defendants)

136.    The allegations contained in paragraphs 1-135 are hereby restated and re-incorporated as if fully set forth herein.

137.    At all relevant times hereto, Careismatic was engaged in trade or commerce as defined under Mass. Gen. Laws ch. 93A, § 1(b).

138.    Each of the Defendants employed unfair methods of competition, as well as unfair and deceptive acts or practices, in the conduct of their business under the License Agreement, or as part of the Buy-Out and agreeing to the Non-Compete, thereby injuring and damaging PTP. These acts and practices occurred primarily and substantially in Massachusetts, where its harm was felt and commerce was affected.

139.    The violations of ch. 93A, § 2 by Careismatic and Silverts CA were willful and/or knowing violations undertaken in bad faith, and each of Careismatic and Silverts CA are therefore liable to PTP under M.G.L. ch. 93A, §§ 2 and 11, in an amount equal to not less than twice and up to three times PTP's damages by reason of its violations of M.G.L. ch. 93A, § 2.

140.    As a direct and proximate result of Careismatic's and Silverts' violations of ch. 93A, § 2, PTP has suffered injury to its business and property and seeks damages in an amount to be proven at trial, but in excess of the jurisdictional amount of this Court under 28 U.S.C. § 1332(a).

## COUNT V
### (Tortious Interference with Contractual Relations – Silverts DE)

141.    The allegations contained in paragraphs 1-140 are hereby restated and re-incorporated as if fully set forth herein.

142.    Silverts DE knew that Careismatic had entered into the License Agreement with PTP prior to the occurrence of the Buy-Out.

143.    Silverts DE intentionally, improperly, and without justification acted with the purpose of interfering with the License Agreement by engaging in the conduct described herein, including, but not limited to, conspiring with Careismatic to deliberately disregard and breach its contractual obligations to PTP under the License Agreement through procuring the Non-Compete from Careismatic, and guaranteeing that Careismatic would not actively market and promote PTP's Licensed Products as a competing post-surgical, treatment and recovery wear line.

144.    Silverts DE's conduct substantially interfered with and prevented PTP from further receiving the benefits of its License Agreement with Careismatic, namely the Sales Royalties.

145.    As a direct and proximate result of Silverts DE's substantial and tortious interference with PTP's existing contractual relationship with Careismatic pursuant to the License Agreement, PTP has suffered injury to its business and property and seeks damages in an amount to be proven at trial, but in excess of the jurisdictional amount of this Court under 28 U.S.C. § 1332(a).

**COUNT VI**
**(Section 4 of the Clayton Act, 15 U.S.C. § 15 for**
**Violation of 15 U.S.C. § 1: Contract, Combination, or Conspiracy in Restraint of Trade –**
**Careismatic and Silverts DE)**

146.    The allegations contained in paragraphs 1-145 are hereby restated and re-incorporated as if fully set forth herein.

147.    By virtue of their collective violation of the confidentiality and non-competition provisions of Section 14.1 of the License Agreement, Careismatic and Silverts DE effectuated and manifested the presence of a second competitor in the post-surgical, treatment and recovery wear market, that being Silverts DE, where no second competitor should have existed.

148.    Notwithstanding this fact, the creation of Silverts DE as a separate legal entity as part of the Buy-Out process ultimately means that an entity such as Silverts DE was removed from the definition of "Licensee Group" under the License Agreement.

149.    While the presence of a second entrant and competitor into the post-surgical, treatment and recovery wear market conforms to the spirit of a free enterprise marketplace (even if such entrance is procured through illicit means in this instance), the placing of an unreasonable restraint on trade is not.

150.    Due to its creation as a separate legal entity, Silverts DE became a horizontal competitor to PTP in the post-surgical, treatment and recovery wear market at the time of its creation on or about October 23, 2024.

151.    Silverts DE is competing with PTP in the same defined "Territory" that Careismatic was obligated to use "best efforts" to "vigorously" exploit for PTP's Licensed Products pursuant to Section 1.3 of the License Agreement.

152.    As part of the Buy-Out, Careismatic and Silverts DE entered into a Non-Compete agreement to hinder, impede, delay, obstruct, and/or prevent Careismatic from fulfilling its contractual obligations to market and exploit PTP's Licensed Products under the License Agreement that would otherwise be competing with Silverts DE in the same "Territory".

153.    The Non-Compete between Careismatic and Silverts DE is an unlawful agreement or arrangement that has the effect of limiting competition in the "Territory" defined under the Licensed Agreement for the post-surgical, treatment and recovery wear market that each of PTP and Silverts DE sell.

154.    The result of this unlawful agreement or arrangement is that Careismatic and Silverts DE were enabled to restrain trade, control prices, and maintain a monopoly within the

"Territory" defined under the License Agreement for the post-surgical, treatment and recovery wear market. It has also insulated Silverts DE from competing with PTP, its only other competitor in this market, by preventing the offering of new, diverse, and higher quality goods and services to the detriment of consumers in the marketplace.

155.    Because the Non-Compete has the effect of restricting the only other source of output in the post-surgical, treatment and recovery wear market – that being PTP's Licensed Products through Careismatic's marketing of the same pursuant to the License Agreement – the Non-Compete constitutes a *per se* unreasonable restraint on trade.

156.    The Non-Compete also effectively acts as a boycott of PTP's Licensed Products through Silverts DE persuading Careismatic not to deal any further with fulfilling its contractual obligations to PTP under the License Agreement, and such boycott is also a *per se* unreasonable restraint on trade.

157.    Even if not viewed as a *per se* illegal restraint on trade, there is no pro-competitive justification for the anti-competitive conduct of Careismatic and Silverts DE that outweighs its anti-competitive effects, such as the prevention of access to and competition in the post-surgical, treatment and recovery wear market by PTP. Any possible pro-competitive benefits for such conduct could have been obtained by less restrictive alternatives, and the restraints alleged here were not reasonably necessary to achieve those pro-competitive benefits.

158.    Upon information and belief, the Non-Compete is not limited or narrowly-tailored in its scope or geographical reach, and therefore has the effect of preventing any competition from PTP in the area defined as the "Territory" under the License Agreement.

159.    Careismatic and Silverts DE conspired together to frustrate, delay and hinder the marketing, promotion, and sale of PTPs' Licensed Products through the agreement to the Non-Compete.

160.    The injury to PTP was a foreseeable consequence of Careismatic and Silverts DE's anti-competitive and unlawful conduct described herein, which was done with the intent of restraining trade and interstate commerce, and monopolizing the post-surgical, treatment and recovery wear market within the "Territory" defined under the License Agreement, specifically in order to eliminate any competition to be faced by Silverts DE from PTP.

161.    By improperly and illegally hindering, impeding, delaying, obstructing, and/or preventing PTP from competing with Silverts DE in the post-surgical, treatment and recovery wear market through the presence of the Non-Compete, Careismatic and Silverts DE collusively restrained trade and commerce, and prevented competition in this market throughout the "Territory" defined in the License Agreement. Silverts DE continues to actively maintain a monopoly hold and/or market power therein.  This has resulted in anti-competitive effects throughout the relevant market, including higher prices, constricted market output, and lessening consumer choices for available post-surgical, treatment and recovery wear products.

162.    Consumers have been injured, and will continue to be injured, by the absence of competition in the market through higher prices and more limited goods than would otherwise have been available had Careismatic and Silverts DE not agreed to the Non-Compete, and had Careismatic and Silverts DE not unlawfully hinder, impede, delay, obstruct, and/or prevent PTP's Licensed Products from competing with Silverts DE's products.

163.    As the only other competitor to Silverts DE in the post-surgical, treatment and recovery wear market within the "Territory", PTP suffered a direct, cognizable, and unique injury

to its business and property that is of the kind specific to antitrust injuries because the actions of Careismatic and Silverts, in agreeing to the Non-Compete, were not mere "strategic", good-faith business decisions aimed at defeating another competitor in the marketplace, but were ultimately aimed at restraining trade and/or preventing competition more broadly in the same market from the ***only*** other existing competitor for the same goods sold by Silverts DE.

164.     PTP's damages may also include legal remedies to disgorge any sums obtained by Silverts DE, after execution of the Non-Compete with Careismatic, in selling its products while utilizing certain of the misappropriated Confidential Information PTP licensed to Careismatic under the License Agreement to do so, and reaping unfair market benefits through their wrongful, illegal, and anti-competitive conduct.

165.     As a further result of the unlawful acts perpetrated by Careismatic and Silverts DE, they have hindered, impeded, and otherwise engaged in conduct that is anti-competitive and has otherwise interfered with and impeded competition.

166.     As a direct and proximate result of the actions of Careismatic and Silverts in agreeing to the Non-Compete, and violating Section 1 of the Sherman Act, 15 U.S.C. § 1, PTP is entitled to an award of treble damages for its injuries pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and shall prove the amount of such damages at trial, but in excess of the jurisdictional amount of this Court under 28 U.S.C. § 1332(a).

### COUNT VII
### (Section 4 of the Clayton Act, 15 U.S.C. § 15 for
### Violation of 15 U.S.C. § 2: Monopolization – Silverts DE)

167.     The allegations contained in paragraphs 1-166 are hereby restated and re-incorporated as if fully set forth herein.

168.    The conduct of Silverts DE, in procuring the Non-Compete from Careismatic, not only placed a *per se* unreasonable restraint on trade, but also effectuated a monopolization of the post-surgical, treatment and recovery wear market, with the specific intent to gain or maintain power to monopolize part of interstate commerce and trade.

169.    The Non-Compete in favor of Silverts DE was an unlawful, anti-competitive plan to prevent PTP's Licensed Products from entering the marketplace within the "Territory" defined under the License Agreement to compete with Silverts DE selling similar products – albeit similar products incorporating misappropriated design elements and other Confidential Information that PTP licensed to Careismatic.

170.    By obtaining the Non-Compete, Silverts DE intended to preserve monopoly power within the "Territory" defined in the License Agreement for the sale of its post-surgical, treatment and recovery wear products.

171.    Silverts DE's monopoly over the market for post-surgical, treatment and recovery wear within the "Territory" defined under the License Agreement is not a result of growth or development as a consequence of a superior product, business acumen, or historic accident, but is the result of the unlawful conduct alleged herein.

172.    By preventing competition from Careismatic actively marketing, promoting, and selling PTP's Licensed Products within the "Territory" defined under the License Agreement, Silverts DE is excluding its ***only*** other, singular competitor within the same market, resulting in a preservation of monopolistic power.

173.    A substantial amount of interstate commerce has been affected through the presence of the Non-Compete in favor of Silverts DE.  Consumers within the "Territory" defined under the License Agreement have been injured and will continue to be injured by the absence of competition

in the market from PTP's Licensed Products through higher prices, more limited output, and fewer consumer choices than would otherwise be available had Silverts DE not sought monopoly power through the procurement of the Non-Compete.

174.    Even if not viewed as a *per se* illegal restraint on trade, there is no pro-competitive justification for the anti-competitive conduct of Careismatic and Silverts DE that outweighs its anti-competitive effects, such as the prevention of, access to, and competition in, the post-surgical, treatment and recovery wear market within the "Territory" defined under the License Agreement by PTP.  Any possible pro-competitive benefits for such conduct could have been obtained by less restrictive alternatives, and the restraints alleged here were not reasonably necessary to achieve those procompetitive benefits.

175.    The injury to PTP was a foreseeable consequence of Careismatic and Silverts DE's anti-competitive and unlawful conduct described herein, which was done with the intent of monopolizing the post-surgical, treatment and recovery wear market within the "Territory" defined under the License Agreement, specifically in order to eliminate any competition to be faced by Silverts DE from PTP.

176.    As a direct and proximate result of the actions of Silverts DE in procuring the Non-Compete, and violating Section 2 of the Sherman Act, 15 U.S.C. § 2 for monopolization, PTP is entitled to an award of treble damages for its injuries pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and shall prove the amount of such damages at trial, but in excess of the jurisdictional amount of this Court under 28 U.S.C. § 1332(a).

**COUNT VIII**
**(Section 4 of the Clayton Act, 15 U.S.C. § 15 for**
**Violation of 15 U.S.C. § 2: Attempt and Conspiracy at Monopolization –**
**Careismatic and Silverts DE)**

177.    The allegations contained in paragraphs 1-176 are hereby restated and re-incorporated as if fully set forth herein.

178.    Careismatic and Silverts DE intentionally and willfully conspired with each other in an attempt to monopolize the post-surgical, treatment and recovery wear market by way of the acts set forth above, including, but not limited to, the agreement to the Non-Compete.

179.    The Non-Compete had the anti-competitive effect of Careismatic ceasing all contractually-obligated "best efforts" to "vigorously" promote PTP's Licensed Products pursuant to the License Agreement, and to effectively eliminate and "freeze out" the only other source of potential competition in said market, within the "Territory" defined in the License Agreement.

180.    Silverts DE's attempted monopoly over the market for post-surgical, treatment and recovery wear within the "Territory" defined under the License Agreement is not a result of growth or development as a consequence of a superior product, business acumen, or historic accident, but is the result of the unlawful conduct alleged herein.

181.    Irrespective of whether Careismatic and Silverts DE were successful in actually monopolizing the post-surgical, treatment and recovery wear market within the "Territory" defined in the License Agreement through the presence of the Non-Compete, their conspiracy and specific intent to attempt to monopolize this market, is also *per se* illegal.

182.    Even if not viewed as a *per se* illegal, there is no pro-competitive justification for the anti-competitive conduct of Careismatic and Silverts DE that outweighs its anti-competitive effects, such as the prevention of, access to, and competition in, the post-surgical, treatment and recovery wear market within the "Territory" defined under the License Agreement by PTP.  Any

possible pro-competitive benefits for such conduct could have been obtained by less restrictive alternatives, and the restraints alleged here were not reasonably necessary to achieve those procompetitive benefits.

183.    The potential injury to PTP through the attempted monopolization was a foreseeable consequence of Careismatic and Silverts DE's anti-competitive and unlawful conduct described herein, which was done with the intent of monopolizing the post-surgical, treatment and recovery wear market within the "Territory" defined under the License Agreement, specifically in order to eliminate any competition to be faced by Silverts DE from PTP.

184.    As a direct and proximate result of the actions of Careismatic and Silverts DE in violating Section 2 of the Sherman Act, 15 U.S.C. § 2, for attempting to monopolize, or combining or conspiring to monopolize, the post-surgical, treatment and recovery wear market within the "Territory" defined under the License Agreement, PTP is entitled to an award of treble damages for its injuries pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and shall prove the amount of such damages at trial, but in excess of the jurisdictional amount of this Court under 28 U.S.C. § 1332(a).

## COUNT IX
**(Section 16 of the Clayton Act, 15 U.S.C. § 26 for Equitable Relief for Violation of 15 U.S.C. § 1: Contract, Combination or Conspiracy in Restraint of Trade – Careismatic and Silverts DE)**

185.    The allegations contained in paragraphs 1-184 are hereby restated and re-incorporated as if fully set forth herein.

186.    Through the presence of the Non-Compete, Careismatic and Silverts DE effectuated a *per se* illegal restraint on trade, within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

187.    Upon information and belief, the Non-Compete between Careismatic and Silverts remains active and enforceable.

188.    PTP, as a director competitor of Silverts DE, is the "best first" party to bring this action, and has suffered injuries to its business and property as a direct result of Careismatic and Silverts DE's violation of the Sherman Act through procuring the Non-Compete. Such injuries suffered are unique antitrust injuries that are not only directly applicable to PTP, but also have a broader, anti-competitive effect on the post-surgical, treatment and recovery wear market within the "Territory" defined under the License Agreement.

189.    As a direct and foreseeable result of Careismatic and Silverts DE's willful and ongoing course of anti-competitive conduct pursuant to the Non-Compete, PTP has suffered irreparable injury for which there is no adequate remedy at law, including injuries that are likely to accumulate and continue if not enjoined.

190.    PTP is accordingly entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Patient To Person, LLC respectfully requests that this Honorable Court enter judgment in its favor, and against each of the named Defendants in this matter, jointly and severally, as follows:

A.  An award of compensatory, exemplary, incidental, consequential, and other damages in the minimum amount of $5 million, or such other amount to be determined at trial, but in excess of the jurisdictional amount of this Court, pursuant to 28 U.S.C. § 1332(a);

B.  To find that Careismatic breached its contractual obligations to PTP under the License Agreement, and breached such obligations in a manner that also breached its covenant

of good faith and fair dealing with respect to the License Agreement, and awarding appropriate damages and other relief in an amount to be proven at trial, but in excess of this jurisdictional amount of this Court pursuant to 28 U.S.C. § 1332(a), pursuant to Counts I and III of this Complaint;

C. To find that Silverts CA, as a member of the "Licensee Group" under the License Agreement, breached its contractual obligations to PTP thereunder, and awarding appropriate damages and other relief in an amount to be proven at trial, but in excess of this jurisdictional amount of this Court pursuant to 28 U.S.C. § 1332(a), pursuant to Count II of this Complaint;

D. To find that each of the Defendants, at various points in time as alleged herein, engaged in unfair methods of competition, and deceptive trade acts or practices, in violation of M.G.L. ch. 93A, § 2, and that pursuant to M.G.L. ch. 93A, §§ 2 and 11, PTP is entitled to an award of damages in an amount to be proven at trial, but in excess of the jurisdictional amount of this Court pursuant to 28 U.S.C. 1332(a), with damages for such violations to be trebled, pursuant to said statute, with interest, pursuant to Count IV of this Complaint;

E. A finding that Silverts DE tortiously interfered with the existing contractual relationship between PTP and Careismatic pursuant to the License Agreement, through the procurement of the Non-Compete, and awarding appropriate damages and other relief in an amount to be proven at trial, but in excess of this jurisdictional amount of this Court pursuant to 28 U.S.C. § 1332(a), pursuant to Count V of this Complaint;

F. To adjudge and declare that each of Careismatic and Silverts DE engaged in unlawful conduct in violation of Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and

2, by placing *per se* illegal and unreasonable restraints on trade, as well as monopolizing, or attempting and conspiring to monopolize, as alleged respectively against each party herein, and that pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, PTP is entitled to an award of damages in an amount to be proven at trial, but in excess of the jurisdictional amount of this Court pursuant to 28 U.S.C. § 1332(a), with damages for such violations to be trebled, pursuant to said statute, with interest, as well as a disgorgement of any amounts that either Careismatic or Silverts DE realized as a result of its violations of Section 1 and Section 2 of the Sherman Act, pursuant to Counts VI, VII, and VIII of this Complaint;

G. To permanently enjoin and restrain all ongoing anti-competitive conduct of Careismatic and Silverts DE, and anyone acting in concert with them, from monopolizing the post-surgical, treatment and recovery wear market within the "Territory" as defined under the License Agreement, and that continues to irreparably injure PTP, including but not limited to, an order restraining and/or permanently enjoining the Non-Compete between Careismatic and Silverts DE, in accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26, pursuant to Count IX of this Complaint;

H. To award PTP the costs of this suit, including but not limited to the expenses of discovery and document production, and its reasonable attorneys' fees; and

I. To award such other and further relief as this Honorable Court deems meet and just.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to *Federal Rule of Civil Procedure 38(b)*, Plaintiff, Patient To Person, LLC, hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,
Plaintiff,
Patient To Person, LLC,

By its Attorney,

*/s/ Alexander D. Schultheis*

_____
Alexander D. Schultheis, Esq. (BBO#694034)
Cohn & Dussi, LLC
255 State Street, Suite 7B
Boston, MA 02109
Tel: (781) 494-0200
Fax: (781) 494-0208
Email: aschultheis@cohnanddussi.com

Dated: December 18, 2025